UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CLARENCE LEE SAYLES                                    CIVIL ACTION

VERSUS                                                 NO:      12-2891

SOCIAL SECURITY ADMINISTRATION                         SECTION: "E" (4)

REPORT AND RECOMMENDATION

I.    Introduction

This is an action for judicial review of a final decision of the Commissioner of Social Security pursuant to Title 42 U.S.C. § 405(g).[1]  The Commissioner denied Clarence Lee Sayles ("Sayles") claim for Disability Benefits and Supplemental Security Income Benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 423, 1382(c).

The matter was referred to the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(b) for the submission of Proposed Findings and Recommendations.

II.   Factual and Procedural Summary

On December 11, 2012, Plaintiff, Clarence Lee Sayles, ("Sayles") filed a Complaint in this Court appealing and seeking judicial review of the determination of the Social Security Administration ("SSA") decision, pursuant to 42 U.S.C.§ 405(g).[2]

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 24(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence section 205(g) of the Social Security Act. 42 U.S.C. §405(g).

[2]R. Doc. 1.

Sayles filed for Social Security Disability Benefits with the SSA on May 25, 2010 alleging that his disability began on November 10, 2003, due to "L3-L5 back pain, degenerative disc "S1" narrowing.[3] Sayles has a twelfth grade education, and prior to his alleged disability, worked as an assistant manager, butcher, cook, driver and stock person. He allegedly stopped working after the onset of his alleged disability on November 10, 2003.

On July 15, 2010, the SSA found that Sayles was not "disabled or blind" under the rules, and denied his claim for benefits because the agency determined that his condition was not severe enough to keep him from working.[4] Shortly thereafter, on August 10, 2010, Sayles filed a request for a hearing with an Administrative Law Judge ("ALJ") in the SSA's Office of Hearings and Appeals.[5]

On February 3, 2011, ALJ Judge Michael D. Cheek, ("ALJ") conducted a hearing in which he reviewed the SSA's decision to deny Sayles's application for disability benefits.[6] On July 29, 2011, the ALJ found that Sayles was not disabled and not eligible for Disability Insurance Benefits or Supplemental Security Income Benefits.[7] Sayles thereafter filed the instant action on December 11, 2012, seeking judicial review of the ALJ's decision, pursuant to 42 U.S.C.§ 405(g).

## III.   <u>Standard of Review</u>

The role of this Court on judicial review under Title 42 U.S.C. § 405(g) is limited to

---

[3]R. Doc. 12-3, p. 3; Disability Determination Explanation, Track ("Tr") 64; *see also* R. Doc. 12-5, Application Summary for Supplemental Security Income, Tr. 143.

[4]R. Doc. 12-4, Notice of Disapproved Claims, Tr. 102.

[5] *Id.* at 110-111.

[6] *Id.* at 112-124.

[7]R. Doc. 12-2, Tr. 16.

determining whether (1) the final decision is supported by substantial evidence and (2) whether the Commissioner applied the proper legal standards when evaluating the evidence. *See Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir.1999).  The Court may not re-weigh the evidence, try issues *de novo*, or substitute its judgment for that of the Secretary. *Allen v. Schweiker*, 642 F.2d 799, 800 (5th Cir. 1981).

Review of the Secretary's decision is limited to "whether [her] findings are supported by substantial evidence in the record and whether [she] applied the correct legal standards." *Emory v. Sullivan*, 936 F.2d 1092, 1093 (10th Cir. 1991). If supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed. *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir.1989).  However, an ALJ's failure to apply the correct legal test constitutes a ground for reversal.  *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

"Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir.1995); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It must do more than create a suspicion of the existence of the fact to be established, but no "substantial evidence" will be found where there is only a "conspicuous absence of credible choices" or "contrary medical evidence."*Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973); *Hemphill v. Weinberger*, 483 F.2d 1137, 1138 (5th Cir. 1973).

A.    **Disability Standard**

To be considered disabled and eligible for supplemental security income benefits, an applicant must show that he is disabled, which is defined by the Social Security Act, as the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental

impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months..." *See* 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). *See also Monfra v. Colvin,* No. 12-2858, 2013 WL 4774730, *2 (E.D. La. Sept. 4, 2013).[8]

In determining whether a claimant is capable of engaging in any "substantial gainful activity," the Secretary applies a five-step sequential evaluation analysis:

(1) A claimant who is working and engaging in a substantial gainful activity will not be found to be disabled no matter what the medical findings are;

(2) A claimant will not be found to be disabled unless he has a "severe impairment";

(3) A claimant whose impairment meets or is equivalent to an impairment listed in Appendix 1 of regulations will be considered disabled without the need to consider vocational factors;

(4) A claimant who is capable of performing work that he has done in the past must be found "not disabled"; and

(5) If a claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and residual functional capacity must be considered to determine whether he can do any work that exists in the national economy.

*See Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).

In determining whether a potential claimant is disabled, medical opinions from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairments will always be considered. *See* 20 C.F.R. § 404.1527. If the record contains a medical opinion from a treating physician on the nature and severity of the claimant's impairments, the Commissioner's Regulations dictate that it must be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques

---

[8]Section § 423(d)(3) of the Act further defines "physical or mental impairment" as "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *See* 42 U.S.C.§ 423(d)(3).

and is not inconsistent with the other substantial evidence in the case record." *See* 20 C.F.R. § 404.1527(c)(2); *see also Frey v. Brown*, 816 F.2d 508, 513 (10th Cir. 1987).

### B.     Mental Impairment Standard

For mental impairments, an additional regulatory process supplements the five-step process detailed above. *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). It requires the hearing officer to record the pertinent signs, symptoms, findings, functional limitations and effects of treatment contained in the case record in order to determine if a mental impairment exists. *Id.* If an impairment is found the examiner must analyze whether certain medical findings relevant to a claimant's ability to work are present or absent. *Id.* The examiner must then rate the degree of functional loss resulting from the impairment in certain areas deemed essential for work. *Id.*[9]

### C.     ALJ Regulations - Treating Physician Rule

The Regulations provide that the ALJ will make a determination based on the available evidence if all evidence received by the ALJ, including medical opinions, is consistent. *See* 20 C.F.R. § 404.1527(c)(4). The Regulations also contain a general rule that greater weight should be given to the medical opinions of treating sources because they are "more likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's medical impairments. *See* 20 C.F.R. § 404.1527(c)(2). However, if a medical opinion issued by a treating physician is not given controlling weight because it is not well-supported or inconsistent with evidence in the record, then the Court will determine the appropriate weight to give the opinion

---

[9]20 C.F.R. § 404.1520(c) provides for the examination of the degree of functional loss in four areas of function considered essential to work. These areas of activities are: daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* The degree of limitation in the first three functional areas are rated on a scale that ranges from no limitation to severe. *Id.* The degree of limitation in the fourth functional area (episodes of decompensation), is rated on the following four-point scale: none, one or two, three, four or more. *Id.*

based on a list of factors found in 20 C.F.R. § 404.1527(d).

The six enumerated factors the ALJ must consider in determining how much weight to give a treating physician's report are: (1) the length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the relevant evidence in support of the medical opinion; (4) the consistency of the medical opinions reflected in the record as a whole; (5) whether the medical provider is a specialist in the area in which he renders his opinions; and (6) other factors which tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1527(c).

Based on the examination of the aforementioned factors, the ALJ must decide how much weight to give the treating physician's opinion. If the results from multiple factors suggest that the treating physician's opinion should be more closely considered despite its inconsistency or lack of support in the record, great weight should be given to it. *See Mosca v. Massanari*, 2002 WL 511522, at *7 (D. Mass. Jan. 30, 2002). In all situations, the Secretary must give specific, legitimate reasons if the ALJ's decision disregards the treating physician's opinion that a claimant is disabled. *See Williams v. Bowen*, 844 F.2d 748, 758 (10th Cir. 1988).

If the ALJ does not discuss or apply the factors listed in 20 C.F.R. § 404.1527(d), the Court may remand the case for re-evaluation if the ALJ assigned more weight to a non-treating source opinion than to the treating physician's medical opinion of the claimant. *Mosca,* 2002 WL 511522, at *7; *see also Baker v. Brown*, 886 F.2d 289, 291 (10th Cir. 1989). In situations where the treating physician's opinion is not given controlling weight, the ALJ must also explain the amount of weight he has assigned to the opinions of State agency medical and psychological consultants. *See* 20 C.F.R. § 404.1527(d)(2).

6

**IV.   Analysis**

Sayles contends that the ALJ erred when it concluded that his impairments are not equal to the severity of the impairments in Appendix 1, Subpart A, Regulations number four including all of the sections described under 1.00 Musculoskeletal System and 12.00 Mental Disorders. *See* R. Doc. 15. Sayles further contends that the ALJ Judge erred when he concluded that Sayles had the residual functional capacity to perform sedentary work. *Id.*

The SSA contends that it properly determined that Sayles' impairments did not meet or medically equal the requirements for presumptive disability. *See e.g.,* R. Docs. 13, 16. The ALJ also contends that the evidence supports its Residual Functional Capacity Assessment. The Court shall analyze each of Sayles' arguments separately.

**A.   Musculoskeletal Systems**

Regarding the musculoskeletal system, Sayles contends that he is disabled due to his L3-5 back pain, degenerative disease and S1 narrowing. As a result, he contends that the ALJ decision is not based on substantial evidence.

In opposition, the Commissioner contends that Sayles' impairments of the musculoskeletal system were not disabling, therefore its findings in that regard, are based upon substantial evidence. The ALJ found that the medical evidence established that Sayles suffers from the following severe impairments: low back disorders and osteoarthritis. The ALJ found that these impairments were severe because they caused more than minimal functional limitations.[10]

Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate,

---

[10]R. Doc. 12-2, ALJ's Decision, Tr. 10, p. 11.

sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

The ALJ noted that Sayle's illness began on November 10, 2003,  when he was injured while working as a truck driver. Specifically, Sayles strained his back while lifting five-gallon bottles of water.[11]  After this injury, Sayles was prescribed muscle relaxants and a course of physical therapy. He was also referred to a Neurosurgeon, Dr. Roger Smith ("Dr. Smith") who ordered an MRI, which showed degenerative changes at the L4-5 disc levels. Dr. Smith noted that Sayles was not a surgical candidate, but ordered an epidural steroid injection and a functional capacity exam ("FCE").[12]

According to the ALJ's report, Sayles was later evaluated by Dr. Karen J. Ortenberg ("Dr. Ortenberg") at Lakefront Physical Rehabilitation, LLC., on August 15, 2006. During this ninety (90) minute appointment, Dr. Ortenberg found that although Sayles was difficult in complying with the physical examination, he had no obvious or outward signs of distress, and he did not change positions frequently.[13]  The ALJ also noted Dr. Ortenberg's opinion that Sayles' MRI  revealed degenerative changes of the lumbar spine without spinal stenosis or foraminal impingement, but that Sayles did not require any assistive devices for ambulation or narcotic prescriptions.[14]

The ALJ further noted that during the next visit with Dr. Ortenberg, Sayles arrived with a

---

[11]R. Doc. 12-2, ALJ's decision,  Tr.12.

[12]*Id.*

[13]R. Doc. 12-2, ALJ's Decision, Trs. 12-15, 07/29/11.

[14]*Id.*

second hand wheelchair which he purchased because he was no longer able to walk without severe pain.[15]  The ALJ further noted that Sayles denied falling or having suffered from any other trauma, and that  he did not display any apparent discomfort or facial grimacing.[16]

The ALJ further noted that when Sayles returned to Dr. Smith he continued to complain of being off-balanced and experiencing lower back pain.[17] During this visit, Sayles again used a wheelchair because he was worried about falling down.[18] Upon examination though, Dr. Smith noted that Sayles was able to stand and stand on his toes without losing his balance and generally neurologically intact.[19]

The ALJ further noted that on March 2, 2011, Sayles was diagnosed with improving right L4 lumbar radiculopathy. It further noted that he did not use any assistive devices and that his gait was within normal limits.[20]  The ALJ found that Sayles' medical records indicated that he was taking significantly less amounts of pain medication since the injection and that he did not complain of falling the entire time the facility had been treating him.[21] Sayles noted to the doctor however, that he fell when he was exiting the shower, but did not know the cause of the fall.[22]

During the ALJ hearing, Sayles testified that he does not have the ability to work due to the

---

[15]*Id.*

[16]*Id.*

[17]*Id.*

[18]*Id.*

[19]*Id*.

[20]*Id* at 14.

[21]*Id*.

[22]*Id.* at 14.

drowsy side effects caused by his medication, and that his condition was becoming progressively worse, as he had difficulty walking and could not stand at a register for more than three hours.[23] After considering the medicals, the ALJ found that Sayles' medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, his statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent that they were inconsistent with his residual functional capacity assessment.[24]

The ALJ further found that Sayles' testimony was inconsistent with the evidence as a whole particularly, his treating physicians noting that he could return to work at medium level.[25] The ALJ gave the greatest weight to the treating source evidence which noted that Sayles did not require surgery, that he reached maximum medical improvement, and that he could return to work in some capacity.[26] As a result, the ALJ found that Sayles could perform work at a sedentary level with the additional limitations as documented in the record.[27]

Sayles' medical records showed that on June 16, 2004, an MRI of his spine was conducted to assess his complaint of low back pain.[28] The MRI report showed that the vertebral bodies were normal in height, signal and alignment.[29] There was no evidence of marrow edema, marrow

---

[23]*Id.*

[24]*Id.*

[25]*Id.*

[26]*Id*.

[27]*Id*.

[28]R. Doc. 12-7, MRI Report, p. 25, Tr. 257, 06/16/04.

[29]*Id.*

replacement, injection or neoplasm.[30] The axial images at L3-L4 showed that there was a minimal bulge.[31] At the L4-L5, there was a mild bulge that flattens the anterior thecal sac and the neural foramina were patent.[32] Additionally there was a mild bulge at the L5-S1 and the neural foramina were patent.[33]

On December 23, 2004, Sayles was seen for a neurosurgical follow-up visit with Dr. Smith.[34] During this visit, Dr. Smith noted that Sayles had a FCE performed at "Health South" on November 9, 2004. Dr. Smith also stated that he agreed with the results of the FCE which suggested that Sayles could not return to work at his old job lifting heavy water bottles off and on trucks.[35] He was released back to medium level work as suggested by the FCE.[36] Dr. Smith further suggested that Sayles should return in four months for one additional visit which would probably result in his discharge.[37]

Sayles medical records also showed that he visited the emergency room several times between December 14, 2005 and July 25, 2008, with complaints of back pain.[38] On August 15, 2006, as stated above, Sayles was referred to Dr. Ortenberg at Lakefront Physical Rehabilitation, LLC.,

---

[30]*Id.*

[31]*Id.*

[32]*Id.*

[33]Id.

[34]R. Doc. 12-7, Dr. Roger D. Smith-TX & Consultant Notes and Radiology, p. 23, Tr. 255, 12/23/04.

[35]*Id.*

[36]*Id.*

[37]*Id.*

[38]R. Doc. 12-7, Ochsner Emergency Room Records & Lab/Radiology Reports, Pgs. 29-45, Trs. 261-277, 12/14/05-07/25/08.

by Dr. Smith, after filing a workers compensation claim. During the visit with Dr. Ortenberg, Sayles reported that his pain was so bad that he was not able to sit or stand and that almost immediately he had radiating symptoms down both legs, reaching all the way down to his feet.[39]

Dr. Ortenberg noted that Sayles was not a surgical candidate. She also noted that he had completed a course of physical therapy at Health South.[40] During the visit, Sayles reported that even though he had one epidural steroid injection, the FCE he had allegedly worsened his condition by increasing his pain.[41]  He ranked his pain as a 10 out of 10, and stated that walking, sitting, or lying down aggravated his symptoms.[42] He also stated that he takes Vicodin, and that using a heating pad or getting a back massage alleviates his pain, but only to a minimal degree.[43]

During his physical examination, Sayles reportedly refused to respond to some of Dr. Ortenberg's questions, specifically those inquiring into his functional limitations, whether or not he smokes, and about his legal representation. She also noted that Sayles' answers were vague, such that Dr. Ortenberg did not feel that the physical evaluation would be helpful for him.[44]  She did note however, that Sayles had no obvious or outward signs of distress, that he did not change positions frequently, nor did he have any facial expressions that would indicate he was in pain at any time during the appointment.[45]

---

[39] R. Doc. 12-7, Dr. Karen J. Ortenberg, Independent Medical Evaluation, Pgs. 47-51, Trs. 279-283, 08/15/06.

[40] Id.

[41] Id.

[42] Id.

[43] Id.

[44] Id.

[45] Id.

Dr. Ortenberg further noted that Sayles was able to sit for forty-five (45) minutes while they discussed his medical condition.[46] She also noted that Sayles used a quad cane which he held  in his right hand during ambulation.[47] With distraction, Dr. Ortenberg also noted that Sayles' motor strength normalized, and that he demonstrated normal motor strength for all muscle groups to both lower extremities.[48] His deep tendon reflexes were 2+ and symmetric with no pathologic reflexes noted. She also noted that his straight leg raising exam was negative and that his lumbar range of motion was within normal limits for flexion, extension and lateral rotation.[49] Finally, she found that there was no evidence of muscle atrophy, nor was there any pain with palpation over the spinous processes or lumbar paraspinal musculature.[50]

Dr. Ortenberg also noted that based upon Sayles injury, she did not believe a quad cane was necessary for him to walk. She also did not believe that Sayles required any type of motorized adaptive equipment to help him move around.[51]  She concluded that it was in Sayles' best interest to stay as active as possible in order for him to avoid negative sequelae, which is a condition associated with deconditioning and a sedentary lifestyle.[52] However, she did not believe that Sayles required ongoing prescriptions of Vicodin or opioid medications. Furthermore, Dr. Ortenberg

---

[46]*Id.* at 281.

[47]*Id.*

[48]*Id.*

[49]*Id.*

[50]*Id.*

[51]*Id.* at 282.

[52]*Id.*

believed that Sayles was able to return to work in some capacity at a medium level,[53] and noted that there would be no return appointments scheduled, as he indicated that he did not want to continue with any form of physical rehabilitation.[54]

After indicating he did not want to undergo rehabilitation, he changed his mind and resumed treatment by Dr. Ortenberg.[55]   Despite this care, Dr. Ortenberg felt that Sayles had reached maximum medical care, even though he reported to his visits with a cane and wheelchair; which she did not feel was necessary.[56] She also noted that Sayles continuously forgot to bring his FCE report with him, and also refused to sign a medical release form permitting Dr. Ortenberg to request it.[57]

The Court notes that while Sayles' contends that he met the listing level impairments necessary to warrant benefits, the medical records suggest otherwise. The Court also finds that the ALJ properly considered the treatment records which support the finding that he is not disabled, and may return to medium level work. As such, the Court finds that the ALJ's decision that Sayles did not meet the listing level impairment regarding his back problems is supported by substantial evidence, and should be affirmed.

## B.  <u>Mental Disorders</u>

Sayles' next contention is that he meets the mental disorders impairment severity requirements necessary to warrant benefits. Therefore he suggests that the ALJ's decision should

---

[53]*Id.*

[54]*Id.* at 283.

[55]R. Doc. 12-7, Dr. Karen Ortenberg, M.D., Independent Medical Evaluation, Pgs.52-54, Trs.284-286, 10/03/06.

[56]*Id.*

[57]*Id. See also* R. Doc. 12-7, Dr. Karen Ortenberg, M.D., Independent Medical Evaluation, Trs. 287-289, 10/19/06. See also report dated 12/08/06.

be reversed, as it is not based upon substantial evidence. *See e.g.,* R. Doc. 15.

In its brief, the Commissioner acknowledges that Sayles was diagnosed with depression, but noted that there was no medical evidence demonstrating that his depression met or medically equaled the necessary requirements. Therefore, the Commissioner contends that the ALJ's decision is based upon substantial evidence. *See e.g.,* R. Doc. 16, pp. 1-2.

Affective Disorders under section 12.04 are "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (WL current through Nov. 14, 2013).

The ALJ found that Sayles' medically determinable mood disorder does not cause more than minimal limitations in his ability to perform basic mental work activities and was therefore, non-severe. The ALJ further found insufficient evidence of a severe mood, adjustment disorder, or related functional limitations.[58]  The ALJ noted that in making the decision he considered the broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments.[59]  The ALJ noted that Sayles experienced no limitation in daily living, social functioning or concentration, persistence or pace, or suffer from episodes of decompensation.[60]

---

[58]R. Doc. 12-2, ALJ Opinion, Pgs. 15-18, Trs. 14-17, 07/29/11.

[59]*Id.*

[60]*Id.*

The ALJ found that because Sayles' medically determinable mental impairment caused no more than "mild" limitations in any of the first three functional areas, and because he had "no" episodes of decompensation with extended duration in the fourth area, it was non-severe.[61] The ALJ also gave great weight to the opinion of James M. Mours, Psy. D., ("Dr. Mours") who performed a psychological consultative examination of Sayles on July 8, 2010, at the request of Disability Determination Services.[62] After examining Sayles, Dr. Mours did not assign an AXIS 1 or 2 diagnosis, and concluded that the medical health issues did not appear to affect Sayles' functioning.[63]   The record also contains a form entitled "Medical Statement Concerning Depression for Social Security Disability."  This form indicates that Sayles was depressed and that there was evidence of marked restriction of activities of daily living and difficulty in maintaining social functioning.[64] Although it is unclear who completed this document, it does not appear that it was completed by a physician, as there is a Mobility Impairment Form attached to the form. This mobility form  is ione that is usually a document distributed from the Office of Motor Vehicles.  In any event, the medical statement form indicates that Sayles experienced deficiencies in concentration, persistence and pace, and has suffered with repeated episodes of decompensation and/or deterioration.[65]

The form indicates that Sayles was markedly impaired in his ability to remember locations, work procedures, short simple instructions, and detailed instructions. It also indicates that he was

---

[61]*Id.*

[62]*Id.* at Trs. 10-11

[63]*Id.*

[64]R. Doc. 12-7, Medical statement concerning depression, P.364-365,01/30/12.

[65]Id.

markedly impaired in his ability to work in coordination with, and proximity to, others without being distracted, in his ability to make simple work related decisions, in his ability to accept instructions and to interact appropriately with the general public.

The Court notes that to qualify under Criteria A, for depression, a claimant needs at least four symptoms.  Dr. Mours noted however, that Sayles' denied symptoms of depression, and observed that Sayles had a normal speech flow, logical and relevant speech content, a good attitude, an appropriate affect, appropriate interpersonal interactions and possessed adequate judgment.[66] Further, Dr. Mours noted that there were no notable impairments in Sayles' thought content or form, nor did he have phobias, obsessions, delusions, or auditory or visual hallucinations, anxiety, or depression.[67] Dr. Mours also noted that Sayles' judgment and insight were normal, and his short and long term memory were also good.[68] Finally, Dr. Mours concluded that Sayles demonstrated mental and emotional capabilities to understand and manage his own money.

As such, the Court finds that to suffer from "depression" a claimant must also qualify under Criteria B, with at least two areas of marked difficulty, or with one area of marked difficulty and repeated episodes of decompensation.[69] Because Dr. Mours did not find any evidence of marked difficulties in any area or repeated episodes of decompensation, as well as his other findings, the Court finds that the ALJ's opinion that Sayles did not meet the listing level requirement for his depression is based upon substantial evidence.

------------------------------------------------------------

[66]R. Doc. 12-7, Dr. James M. Mours, New Orleans Psychological Services, LLC., Pgs. 105- 108; Trs. 337-340, 07/08/10.

[67]*Id.*

[68]*Id.* at 339.

[69]*Id.*

C.    **Ability to perform Sedentary Work**

Sayles also contends that he does not have the residual functional capacity to perform sedentary work. As a result, he contends that the ALJ's decision is not based upon substantial evidence. *See e.g.,* R. Doc. 15.

In contrast, the Commissioner contends that the evidence supports the ALJ's residual functional capacity assessment, as Sayles failed to cite to any evidence to support his contention that he could not perform sedentary work. The Commissioner points out that two doctors concluded that Sayles could perform either medium work or light work. Therefore, the Commissioner argues that no physician concluded Sayles was limited to sedentary work as he contends. *See e.g.,* R. Doc. 16.

The ALJ found that Sayles had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except that he could lift five pounds frequently and ten pounds occasionally.[70] Sayles could occasionally climb stairs, but no ladders; and could occasionally stoop, kneel, crouch, and crawl. However, he would require the ability to alternate between sitting and standing, due to his back pain following his on-the-job injury.

In making this finding, the ALJ considered Sayles' history as reported by Dr. Ortenberg and the records which reported that Sayles strained his back when he lifted five-gallon bottles of water.[71] The medical records indicate that Sayles was seen at Concerta Medical Center and was prescribed muscle relaxers and a course of physical therapy, which allegedly did not make him feel better, despite being released to light duty.[72] The records also show that Sayles sought treatment from

---

[70]R. Doc. 12-2, ALJ Decision, Pg. 13-16, Tr. 12-15 (07/29/12).

[71]*Id.*

[72]*Id.*.

18

neurosurgeon, Dr. Smith, who ordered an MRI which showed degenerative changes at the L4-5, and concluded that Sayles was not a surgical candidate.[73] As a result, he underwent a epidural steroid injection and an FCE which according to Sayles, made his condition worse.[74]

The ALJ also noted that the doctor had difficulty obtaining honest and clear answers from Sayles that would have been helpful in rendering his opinion. Furthermore, Dr. Smith did not note that there were any outward signs of discomfort or pain during the appointment, although Sayles would not comply with a physical examination in order to assess his physical abilities. Nonetheless, according to the ALJ, Sayles did not require any ambulatory device nor any narcotic pain medication.[75]

After reviewing Dr. Smith's findings, the remaining medical records and the totality of the evidence, the ALJ found that Sayles medically determinable impairments could reasonably be expected to cause his symptoms of pain. [76] However, the ALJ found that Sayles' statements regarding the intensity, persistence and limiting effects of these symptoms were not credible to the extent that they were inconsistent with his residual functional capacity assessment.[77]

The Residual Functional Capacity Assessment ("RFC") completed by Dr. Doris LeBlanc ("Dr. LeBlanc") shows that Sayles has disorders of back-discogenic of a degenerative nature which was primary, and other affective disorders which were secondary.[78] The RFC indicates that there was

---

[73]*Id.*

[74]*Id.*

[75]*Id.*

[76]*Id.*

[77]*Id.*

[78]R. Doc. 12-3, Disability Determination Explanation, Pgs. 28-40, Trs. 89-101, 07/15/10.

insufficient evidence of restrictions of activities of daily living, difficulties in maintaining social functioning, maintaining concentration persistence,  pace, or repeated episodes of decompensation of an extended duration.[79] The RFC also indicates that there was insufficient evidence of objective medical evidence as to Sayles' statements of intensity, persistence and functionally limiting effects of the symptoms.[80]

Dr. LeBlanc found that Sayles had an exertional limitation, as he could occasionally lift and/or carry up to 20 lbs and frequently lift or carry up to 10 lbs.[81] She found that Sayles could stand/walk and sit for six hours in an eight hour day.[82] She further found that there was no limitation regarding Sayles ability to push and/or pull,[83] and that as to his posture, Sayles could occasionally climb ramps and stairs, but could never climb ladders, ropes, scaffolds, or balance on an unlimited basis.[84] Dr. Leblanc further concluded that Sayles could occasionally stoop, kneel, crouch and crawl,[85] and that he did not have any manipulative, visual, communicative or environmental limitation.[86] As such, after having reviewed the medical records and the RFC report, the Court finds that the ALJ's conclusion that Sayles could perform sedentary work is supported by substantial evidence.

---

[79] Id.

[80] Id.

[81] Id.

[82] Id.

[83] Id.

[84] Id.

[85] Id.

[86] Id.

V.      **Recommendation**

Accordingly,

It is **RECOMMENDED** that the Commissioner of Social Security's final decision denying

Plaintiff, Clarence Lee Sayles' ("Plaintiff") claim for Disability Benefits and Supplemental Security

Income Benefits under Titles II and XVI of the Social Security Act, 42 U.S.C.§§ 423, 1382(c), be

**AFFIRMED** as its decision was based on substantial evidence, pursuant to Title 42 U.S.C. § 405(g).

A party's failure to file written objections to the proposed findings, conclusions, and

recommendation in a magistrate judge's report and recommendation **within FOURTEEN (14) days**

after being served with a copy shall bar that party, except upon grounds of plain error, from

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by

the district court, provided that the party has been served with notice that such consequences will

result from a failure to object.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th

Cir. 1996).[87]

New Orleans, Louisiana, this 23rd day of  December 2013.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[87] *Douglass* referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

21